# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1471V
UNPUBLISHED

| | |
|---|---|
| NICOLE FORTNEY,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: January 29, 2025 |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.

*Meghan Murphy*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON DAMAGES**[1]

On October 27, 2020, Nicole Fortney filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she developed a shoulder injury related to vaccine administration ("SIRVA") as a result of a Hepatitis A/B ("Hep A/Hep B") vaccine administered to her on June 6, 2018. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although a ruling on entitlement in Petitioner's favor was issued in early August 2022, the parties have been unable to resolve damages on their own.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$82,043.44, representing $75,000.00 for actual pain and suffering and $7,043.44 for past unreimbursed expenses. I also find that Petitioner is entitled to $4,948.11 for her lost wages (although this sum must be adjusted by the parties to account for taxes).**

## I. Relevant Procedural History

Almost two years after the case was filed, Respondent filed his Rule 4(c) Report in July 2022 conceding that Petitioner was entitled to compensation. Respondent's Report at 1. ECF No. 47. In view of Respondent's position, a Ruling on Entitlement was entered in Petitioner's favor. ECF No. 48. Thereafter, the parties attempted to informally resolve the issue of damages, but reached an impasse on an appropriate award and asked me to issue a briefing schedule. ECF No. 61.

Petitioner filed her damages brief on August 21, 2023 requesting that I award (a) $120,000.00 for actual/past pain and suffering; (b) $7,534.44 for unreimbursable expenses; and (c) $9,321.20 in lost wages. Petitioner's Damages Brief ("Brief") at 22, 24, 34. ECF No. 69.

On November 9, 2023, Respondent filed a damages brief proposing the lesser award of $61,000.00 for Petitioner's actual/past pain and suffering, $1,856.15 for her unreimbursable expenses, and no award for lost wages. Respondent's Damages Brief ("Opp.") at 1, 20. ECF No. 72. Petitioner filed her reply on December 22, 2023. ECF No. 74.

## II. Pain and Suffering

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering, and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

2

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### B. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. That analysis relies on review of the record as a whole, including the medical records, affidavits, and written briefs. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and I take into account my experience adjudicating these cases. Based upon the above, I note and find the following:

- In her affidavit, signed on December 7, 2020, Petitioner states that she graduated from massage therapy school and passed the licensure examination in May 2017. Ex. 20 at 1. She goes on to say that "in October 2017, I began working part-time as an independent contractor. Then in November 2017, I was hired to work as a part-time employee for a massage business. My work was just beginning to take off, and I was in very good health." *Id.* at 2.

- On June 6, 2018, Petitioner received the Hep A/B vaccine in her left deltoid. Ex. 1 at 1; Ex. 7 at 7. She was 35 years old. *Id.*

- Petitioner submitted additional written testimony indicating that when the vaccine was injected into her arm on June 6, 2018, "I felt a tremendously intense sensation in my shoulder joint . . . I looked at my bleeding shoulder and said that I felt faint and began to lower my head forward. A strange feeling came over me. When I regained consciousness, I expected to be in my bed awaking from a dream, but quickly realized that I was at the pharmacy and had passed out. Intense pain and pressure were felt in my left shoulder." Ex. 20 at 3.

- On June 8, 2018 (two days post-vaccination), Petitioner called Patient First and reported that "she had Hep A/B vaccination in her left deltoid muscle . . . passed out at the time, and then had feeling of pins/needles in arm/hand/fingers which has improved; however, today [Petitioner] noticed when raising her arm she has numbness in the forearm, pinky finger has feeling of pins/needles and left hand feels cool." Ex. 6 at 5.

- Later on June 8, 2018, Petitioner presented for an examination at Patient First. Ex. 6 at 2. Her chief complaint was a "2-day history of arm numbness . . . after a hepatitis B injection." *Id.* Petitioner was prescribed a Medrol dose pack. *Id.*

- A representative from Patient First telephoned Petitioner on June 11, 2018 to "follow up" on her report of injury. Ex. 6 at 2. Petitioner reported "still having some pain/stiffness when raising arms above head" and noted that she continued to take the Medrol dose pack. *Id.*

- Also on June 11, 2018, Petitioner was seen at UPMC Pinnacle Health, Bone and Joint Center ("UPMC") for "pain in her left shoulder after an injection. Ex. 12 at 9. The notes documenting this appointment indicate that Petitioner "passed out and she had some numbness and tingling . . . [the symptoms are] only in her left arm and spreading to her chest and neck. [Petitioner] states she hasn't been using her arm as much since it's painful . . . [s]he was given a prednisone pack which did help her." *Id.*

- Petitioner maintains that "[t]he condition of my shoulder caused me to reduce the number of clients that I would see in a day at the massage business. I also did not try to gain more clients than the couple I had at the independent contractor position." Ex. 20 at 4.

- Petitioner visited orthopedic surgeon Dr. Timothy S. Ackerman on July 12, 2018 (1 month, 6 days post-vaccination), at Arlington Orthopedics. Ex. 5 at 4-5. Petitioner reported that her "shoulder pain started on June 6, 2018 [after] she received an

4

injection . . . she passed out." *Id.* at 4. It was further noted that Petitioner's pain "increases with abduction, flexion, pulling and pushing weight . . . She is unable to fold her laundry due to increased pain . . . she is doing home exercises." *Id.* Petitioner rated her pain as a two on a ten-point pain scale. *Id.* Dr. Ackerman's assessment was "[l]eft shoulder rotator cuff tear, acute strain, incomplete, traumatic." *Id.*

- In her affidavit, Petitioner states that although Dr. Ackerman recommended that she participate in formal physical therapy, "due to the cost, I chose to perform exercises on my own." Ex. 20 at 5.

- Petitioner underwent an MRI on July 24, 2018. Ex. 5 at 12-13. The test revealed moderate supraspinatus tendinosis and a "[t]iny insertional tear of the infraspinatus tendon." *Id.* at 13.

- On August 2, 2018, Petitioner consulted with Jacqueline Hirsch, PA-C, at Arlington Orthopedics, regarding her left shoulder pain. Ex. 5 at 6-7. The medical notes document that Petitioner rated her pain as a three on a ten-point pain scale and that the physical exam "reveal[ed] tenderness to palpation anteriorly, laterally and posteriorly." *Id.* at 6. Petitioner was assessed with left shoulder rotator cuff tendinitis, given a cortisone shot, and instructed to take ibuprofen for pain. *Id.* at 6-7.

- Petitioner states "my shoulder impacted my ability to do work, and for the massages that I was able to perform, I received some poor feedback from clients . . . It was very difficult to manage the irritable and depressed feelings that came up as I tried to navigate my activities of daily living while being a good mom to my eight- and ten-year-old children. Due to the pain, my independent activities of daily living were omitted as much as possible or performed by my husband." Ex. 20 at 5.

- Petitioner attended a medical appointment at UPMC to establish care on August 15, 2018. Ex. 15 at 11-14. The medical notes do not reflect any report of shoulder pain. *Id.*

- Petitioner reported to UPMC on August 28, 2018 for an annual examination. Ex. 15 at 17-20. The medical notes documenting this visit do not mention Petitioner's shoulder pain. *Id.*

- Petitioner returned to Dr. Ackerman for an evaluation of her left shoulder on September 6, 2018 (3 months post-vaccination). Ex. 5 at 8-9. Petitioner rated her pain as a two on a ten-point pain scale and stated that she worked as a massage therapist and "had to cut back her hours." *Id.* at 8. Petitioner also stated that she

5

recently increased her workload and that her shoulder pain was improving. *Id.* Petitioner was assessed with left shoulder rotator cuff tendinitis and left shoulder impingement syndrome and was given her second cortisone injection. *Id.*

- On December 6, 2018 (now six months post-vaccination), Petitioner returned to Dr. Ackerman for a recheck of her left shoulder. Ex. 5 at 10-11. Noting her occupation as a massage therapist, Petitioner stated that "direct pressure with her arm bent gives increased pain" and rated her pain as a two on a ten-point scale. *Id.* at 10. Dr. Ackerman's diagnoses included left shoulder subacromial bursitis, impingement, and rotator cuff tendinitis as well as "left upper extremity cubital tunnel syndrome versus cervical radiculopathy." *Id.* Petitioner was administered her third cortisone injection at this visit. *Id.* at 11.

- Petitioner underwent a nerve conduction study and electromyography on December 20, 2018. Ex. 14 at 7-8. While no evidence of cervical radiculopathy, brachial plexopathy or peripheral neuropathy was found, it was determined that Petitioner "may have SIRVA…" *Id.* at 8.

- On January 14, 2019, Petitioner returned to UPMC for a follow-up examination regarding "cellulitis of right medial upper leg." Ex. 15 at 25-27. The medical notes documenting this appointment indicate that Petitioner underwent acupuncture and "since about one week after [this treatment,] her arm no longer goes numb." *Id.* at 25.

- Petitioner received acupuncture treatment for matters that included left shoulder pain from Dr. Edwin Aquino on March 12, 2019. Ex. 14 at 4-5. Her assessment included "left shoulder pain, SIRVA." *Id.* at 4.

- Petitioner visited Dr. Aquino for acupuncture treatment again on March 26, 2019. Ex. 14 at 6. He noted that Petitioner's left shoulder was "significantly improved with increased functional level," with active range of motion "close to full without any pain complaint" on examination. *Id.*

- On May 2, 2019 (almost 11 months post-vaccination), Petitioner attended a medical appointment with Dr. Gregory Willis concerning her cervical dysplasia. Ex. 17 at 39-45. The medical notes indicate that she reported right hip pain "since approximately March [but] is not sure what happened" and that she "did have fall and a trauma to her left shoulder and neck." *Id.* at 39. The medical notes do not indicate that Petitioner reported ongoing issues with her left shoulder during this visit. *Id.* at 39-45.

- In her supplemental affidavit, signed on August 20, 2023, Petitioner states that the "fall and neck trauma to my left shoulder and neck" referenced in Dr. Willis' May 2,

6

- 2019 medical note was "the loss of consciousness I experienced when I received my vaccination on June 6, 2018." Ex. 33 at 1-2.

- On May 28, 2019, Petitioner returned to UPMC with a complaint of leg pain. Ex. 19 at 15-18. There is no indication that Petitioner's left shoulder was discussed. *Id.*

- On June 6, 2019, Petitioner reported to her dermatologist for evaluation of her acne. Ex. 23 at 15-19. There is no indication that Petitioner's left shoulder was discussed. *Id.*

- Petitioner testified that, "[t]hroughout 2019, my husband continued to help with the housework, as well as being the primary source of income for our family . . . My shoulder limited the number of clients I could see at work and the activities I could do in the rest of my life. I began to develop right elbow tenderness and pain from using it to perform as much of my activities as possible to avoid pain in my left shoulder and arm." Ex. 20 at 6-7.

- On February 29, 2020, Petitioner visited AllBetterCare Urgent Care Center for a tuberculosis screening. Ex. 22 at 2-4. There is no indication that Petitioner's left shoulder pain was discussed during the screening. *Id.*

- Petitioner attended a follow-up medical appointment concerning her cervical dysplasia on September 11, 2020 (a little over 2 years post-vaccination, and approximately 1.5 years since her last report of left shoulder symptoms in March 2019). Ex. 25 at 7-14. The notes reflect that Petitioner "has some ongoing discomfort related to a left shoulder injury and a 3/10 today." *Id.* at 7.

- In her supplemental affidavit, signed on August 20, 2023, Petitioner states that "as I entered 2021, I continued to experience residual left shoulder pain and limited function related to my SIRVA. As time went on, it became apparent that I was going to need additional treatment . . . However, the cost of treatment, my busy schedule with family and work, and the ongoing pandemic, all impacted my plans to seek further care for my left shoulder. In fact, due to concerns for the pandemic affecting my young family, I limited my medical care in 2020 and 2021 to my annual gynecologic oncology follow up related to my history of cervical cancer." Ex. 33 at 2.

- Petitioner further maintains that "[t]hroughout 2021, my left shoulder pain increased with activity, including cooking, driving, cleaning, showering, and my work as a massage therapist." Ex. 33 at 2.

- The notes documenting Petitioner's November 15, 2021 medical appointment concerning her cervical dysplasia indicate that she "has some musculoskeletal complaints involving her left shoulder." Ex. 28 at 8.

- Petitioner returned to Dr. Ackerman on December 14, 2021 (approximately 3.5 years post-vaccination and almost 3 years since she last sought treatment for her left shoulder). Ex. 26 at 9-13. Petitioner now reported that "the pain [in her left shoulder] has been going on . . . since June 2018 and was possibly caused by an immunization injection for travelling." *Id.* at 9. Petitioner further reported that, at its worst, her pain was a six on a ten-point pain scale and described it as a burning, dull ache. *Id.* On exam, Petitioner had good range of motion, pain with abduction, tenderness to palpation posteriorly, a positive impingement test, and some weakness of the supraspinatus and infraspinatus muscles. *Id.* at 12. She was assessed with left shoulder tendinitis, bursitis, impingement syndrome, and a nontraumatic incomplete rotator cuff tear. *Id.*

- Petitioner underwent a second MRI of her left shoulder on January 10, 2022. Ex. 27 at 1-2. It revealed "[m]ild supraspinatus and crossover tendinopathy with partial-thickness interstitial tearing involving the posterior supraspinatus and crossover tendon peri-insertional fibers" and "[m]ild subacromial/subdeltoid bursitis." *Id.*

- Petitioner returned to UPMC for an orthopedic evaluation and treatment on February 14, 2022. Ex. 30 at 8-12. She again reported that her left shoulder pain began in 2018, rated her discomfort as a six on a ten-point pain scale, and noted that her injury had impacted her ability to work. *Id.* at 8. Petitioner was assessed with left rotator cuff tendinitis, bursitis of the left shoulder and impingement syndrome of the left shoulder. *Id.* at 11. It was further noted that Petitioner "failed multiple conservative treatments including physical therapy, injections, medications, and massage." *Id.* at 12. "Due to her continued symptoms and interference with her activities of daily living and quality of life," surgical arthroscopy of the left shoulder was recommended. *Id.*

- Petitioner underwent a left shoulder diagnostic and operative arthroscopy with debridement on March 18, 2022 (3 years, 9 months and 12 days post-vaccination). Ex. 29 at 5-6. The operative report states that Petitioner had experienced left shoulder pain since 2018 and that she attributed her symptoms to "an immunization injection for traveling." *Id.* at 5. It was also noted that Petitioner's injury impacted her ability to work. *Id.* Although Dr. Ackerman, the operating physician, pulled Petitioner's rotator cuff into full range of motion, he found no evidence of a rotator cuff tear, subscapularis tear or bursitis. *Id.* at 6. His postoperative diagnosis was "[l]eft shoulder torn labrum." *Id.* at 5.

8

- Petitioner next visited Dr. Ackerman on March 28, 2022. Ex. 30 at 14-17. He noted that Petitioner's "shoulder has been quite achy and sore since the surgery, although pain is decreasing. She has been wearing the shoulder immobilizer faithfully, of course coming out of the immobilizer to do her exercises. The pain is rated as a 1/10, on a 0-10 pain scale." *Id.* at 14.

- Petitioner began a post-operative course of physical therapy on April 7, 2022. Ex. 31 at 39-43. The initial evaluation states that Petitioner's pain ranged from a one through eight on a ten-point pain scale and that "she had no left shoulder pain or dysfunction prior to receiving a vaccination in her left arm in June 2018. Her goal is to be able to return to her work as a massage therapist." *Id.* at 39-40. Her current functional status was described as "Max Difficulty" for her activities of daily living, and she was noted to be "[u]nable to perform recreational and work activities." *Id.* at 39.

- On April 25, 2022, Petitioner returned to UPMC for a follow-up visit regarding her left shoulder. Ex. 30 at 19-22. She reported that her "shoulder feels great and pain has overall been decreasing." *Id.* at 19. Petitioner rated her pain as a zero on a ten-point scale. *Id.* at 19.

- Petitioner was discharged from post-operative physical therapy after nine sessions on May 5, 2022. Ex. 31 at 10-13. She reported that her shoulder felt "90% better," noted that her pain ranged between zero and two on a ten-point pain scale, and stated that she was "thinking about trying to do some massage again." Ex. 31 at 10.

- Petitioner returned to UPMC on May 23, 2022. Ex. 32 at 6-9. The medical notes documenting this visit indicate that Petitioner was following a home exercise plan and that she was able to perform activities of daily living "with more ease." *Id.* at 6. Petitioner rated her left shoulder pain as a zero on a ten-point pain scale and indicated that her pre-operative symptoms had completely resolved. *Id.*

- Petitioner was examined by Dr. Ackerman on July 14, 2022. Ex. 32 at 11-14. During this visit, Petitioner reported that her shoulder was "still quite achy and sore but pain overall been decreasing." *Id.* at 11. Dr. Ackerman noted that Petitioner "is back to yoga and gardening, feeling much better. She states her pain as a 0/10 on the pain scale. She has been doing [activities of daily living] with more ease." *Id.* The plan was for Petitioner to "continue working on strengthening and range of motion to the left shoulder with formal physical therapy." *Id.* at 14.

- In her affidavit, Petitioner states that her shoulder injury "has been tremendously stressful and painful, and regrettably, I could not garden or do yoga to cope. I

purchased a car that was easier to drive . . . [f]or a long time, I could not hug my children without pain in my left arm." Ex. 20 at 7.

The case record overall establishes that Petitioner experienced a moderate SIRVA injury in the ten months after her June 6, 2018 vaccination. During this period, she consistently sought treatment from both her orthopedist and acupuncturist, received three cortisone injections, and underwent one MRI. *See generally* Ex. 5; Ex. 14. Her diagnoses included tendinitis, impingement, and bursitis – all occurring in her left shoulder. Ex. 5 at 6-8, 11. However, she did not participate in physical therapy (choosing to perform self-directed exercises due to a lack of insurance) and only rated her pain as high as "three" on a ten-point pain scale. Ex. 5 at 4, 6, 8; Ex. 20 at 5; Ex. 25 at 7. And by March 26, 2019 (almost ten months post-vaccination), it was determined that Petitioner's left shoulder had "significantly improved with increased functional level" and that she exhibited close to full range of motion. Ex. 14 at 6. This record thus corroborated the mild character of Petitioner's injury.

Although Petitioner mentioned "trauma to her left shoulder" during a medical appointment concerning an unrelated issue in May 2019, her injury is not again referenced in the medical records until September 11, 2020 – almost 2.5 years post-vaccination. Ex. 17 at 39. By this time, Petitioner was reporting "some ongoing discomfort related to a left shoulder injury," and rated her pain as a "three" on a ten-point pain scale. Ex. 25 at 7. But she then waited almost another year – until November 15, 2021 – before again mentioning any issues with her shoulder, and did not obtain formal treatment for this injury until December 14, 2021 (around 3.5 years post-vaccination). Ex. 26 at 9-13; Ex. 28 at 8. Although her diagnoses remained consistent (Petitioner was assessed with tendinitis, bursitis, impingement syndrome and a nontraumatic incomplete tear of the left rotator cuff), her pain had increased to a "six" on a ten-point pain scale. Ex. 26 at 9; *Id.* at 12.

After undergoing a second MRI on January 10, 2022 (which revealed "[m]ild supraspinatus and crossover tendinopathy with a partial-thickness interstitial tearing involving the posterior supraspinatus and crossover tendon peri-insertional fibers" and "[m]ild subacromial/subdeltoid bursitis") and following up with Dr. Ackerman on February 14, 2022, Petitioner underwent left shoulder diagnostic and operative arthroscopy with debridement on March 18, 2022 (almost four years post-vaccination). Ex. 27 at 1-2; Ex. 30 at 8-12; Ex. 29 at 5-6. By her first post-operative appointment only ten days later, Petitioner rated her pain as a "one" on a ten-point pain scale. Ex. 30 at 14. And while Petitioner noted that her pain ranged between one and eight at her initial physical therapy session, after attending nine additional sessions over the course of one month, she reported that her left shoulder felt "90% better" and that her pain ranged between a zero and two. Ex. 32 at 11-14. The final medical record is dated July 14, 2022 (over four years

post-vaccination). Although Petitioner reported that her shoulder was "still quite achy and sore," she was performing activities of daily living "with more ease," and she rated her pain as a "zero" on a ten-point scale. *Id.* at 11.

Petitioner argues that she "endured an extensive course of treatment," and that "[h]er pain, suffering, and emotional distress extending through the conclusion of her treatment course in 2022 was all vaccine-related." Reply at 18. In contrast, Respondent asserts that Petitioner only experienced a "mild-to-moderate SIRVA initially with long gaps in treatment, and a markedly different presentation after the treatment gap, demonstrating an unrelated injury." Reply at 9-10. For this reason, Respondent concludes that any award should be limited to the first nine months of Petitioner's treatment course.

Petitioner has provided some reasonable explanations for the substantial lapses in seeking care for her shoulder. In her supplemental affidavit, for example, Petitioner states that she "limited [her] medical care in 2020 and 2021 due to concerns for the [COVID] pandemic." Ex. 33 at 2. And there is no evidence *other* than the treatment gap that Petitioner's symptoms completely resolved within nine months. Nevertheless, I deem the decision to forego treatment for so many extended periods of time as evidence of the mildness or stability of her injury, since it could be endured without medical assistance.

However, while Respondent correctly observes that Petitioner reported "higher pain levels, no radiating pain and no numbness or paresthesias" when she resumed treatment in December 2021, these traits do not represent a "markedly different presentation" of her shoulder injury. As noted by Petitioner, "Dr. Ackerman's physical examination notes from December 6, 2018 . . . are nearly identical to [his] examination notes on December 14, 2021." Reply at 9. I also agree that Petitioner's July 2018 and January 2022 MRIs are consistent with one another as they both "revealed injury involving the supraspinatus tendon" and bursitis. *Compare* Ex. 5 at 12-13 (finding "[m]oderate supraspinatus tendinosis" and a "[t]iny insertional tear of the infraspinatus tendon" as well as "trace fluid within the subacromial subdeltoid bursa") *with* Ex. 27 at 1 (finding "[m]ild supraspinatus and crossover tendinopathy with partial-thickness interstitial tearing" and "[m]ild subacromial/subdeltoid bursitis."). And the recommendation to pursue surgery was based on the continuity of Petitioner's symptoms. Indeed, on February 14, 2022, Dr. Ackerman noted that "[d]ue to [Petitioner's] continued symptoms . . . I recommend surgical arthroscopy of the left shoulder." Ex. 30 at 12.

Nevertheless, while Petitioner's preoperative diagnoses were "[l]eft shoulder rotator cuff tear" and "torn superior labrum," Dr. Ackerman postoperatively determined that "[t]here was no evidence of any rotator cuff tear" and "no evidence of bursitis." Ex. 29 at 5-6. Petitioner was ultimately diagnosed with a torn superior labrum ("SLAP tear"). *Id.* at 5. And this is not the kind of injury that can be SIRVA-attributed. For, as Respondent

11

observes, "[t]he causes of SLAP tears are excessive forces and loads . . . due to trauma, overuse, and wear and tear," and "[t]here is no literature to support that vaccine administration can physiologically cause such excessive forces in this area far removed from the site of injection." Response at 11-12.

Petitioner's arguments to the contrary and unavailing. In her Reply, Petitioner essentially argues that because Respondent conceded entitlement, his contention that SLAP tears "should not be compensated under the umbrella of SIRVA" has been waived. Reply at 15. But this contention lacks legal force. Claimants are *never* entitled to all damages stemming from post-injury medical treatment unless the treatment is associated with the injury. *Robuck v. Sec'y of Health & Human Servs.*, No. 20-0465V, 2023 WL 6214986, at *6 (Fed. Cl. Spec. Mstr. Aug. 21, 2023)("unrelated conditions must be separated out from the damages attributable for a Table SIRVA"). And it has not been established on this record that this aspect of Petitioner's treatment was so associated. Indeed, Dr. Ackerman's records are silent on the matter, and Petitioner's self-reporting of an association do not prove it so. *See, e.g.*, Ex. 31 at 39 (reporting "left shoulder trauma with a vaccine injection.").

The case record thus establishes that Petitioner experienced a moderate SIRVA injury within a year of vaccination, progressing to far more mild symptoms that did not warrant significant treatment for a longer period of time. Although the initial SIRVA may well have somewhat exacerbated unrelated injuries, it cannot be concluded on this record that the SIRVA lead directly to the surgical procedure performed so much later.

Respondent's contention that all of Petitioner's symptoms after her initial nine-month course are completely unrelated to her claim is not wholly persuasive. But the $120,000.00 sum requested by Petitioner is too high. However, the comparison of her own case to the circumstances present in *Langdon v. Sec'y of Health & Human Servs.*, No. 20-1311, 2023 WL 3411103 (Fed. Cl. Spec. Mstr. Apr. 7, 2023)(awarding $99,000.00 for pain and suffering) is useful. The *Langdon* petitioner underwent nine months of treatment for his SIRVA, including six sessions of physical therapy, two therapeutic injections, and two MRI scans. *Id.* at *2. He then waited over two years before seeking care for his shoulder, at which time it was recommended that he proceed with surgery. *Id.* at *3. Over three years after vaccination, that petitioner underwent left shoulder arthroscopy, subacromial decompression and mini-open biceps tenodesis, and had a good subsequent outcome. *Id.*

While the sum awarded in *Langdon* overall seems to provide an apt and fair measure of what is appropriate herein, these two cases are not wholly congruent: That petitioner endured more physical therapy and experienced a shorter gap in treatment. Moreover – and perhaps most importantly -there was no question that the *Langdon* petitioner's sequelae were related to his SIRVA. Accordingly, balancing the severity and

overall course of Petitioner's SIRVA injury and considering the arguments presented by both parties, a review of cited cases, and the record as a whole, I find that **$75,000.00** represents a fair and appropriate amount of compensation for Petitioner's past or actual pain and suffering.

### III. Appropriate Compensation for Past Unreimbursed Expenses

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation ... determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

#### A. Unreimbursed Expenses

Although Petitioner seeks $7,391.35 for unreimbursed out-of-pocket expenses incurred between June 8, 2018 and June 20, 2022, Respondent argues that Petitioner is only entitled to "medical expenses [incurred] between June 8, 2018 and May 24, 2019 ([P]etitioner's last visit prior to the treatment gap)," totaling $1,824.59. Brief at 22; Response at 15. As I noted, the medical records provide evidence that Petitioner's vaccination injury had not resolved within nine months of vaccination and that surgery had been recommended "[d]ue to her continued [left shoulder] symptoms." While the March 18, 2022 operative findings revealed only a SLAP tear, there is no evidence that this injury was wholly unrelated to Petitioner's SIRVA. I have taken into account my doubts about the ultimate relationship between the surgery and the SIRVA in my pain and suffering award – but those same doubts counsel me to be more lenient when it comes to actual medical costs (which are of lesser magnitude in any event).

Therefore, Petitioner is awarded **$6,900.35** - the requested amount for her past unreimbursed expenses save for $491.00 for a "mattress topper" (a purchase that Petitioner did not substantiate as medically necessary under the standards applied in the Program).

#### B. Mileage

Petitioner also seeks $143.09 for travel expenses, in particular mileage associated with her care, which was calculated using the business rate. Brief at 22; Ex. 34, Tab B. Respondent argues that the appropriate calculation should rely on a tax code-related

13

"medical rate," which would result in an award of $31.56. Response at 16-19. As set forth in my recent decision, *Gibson v. Sec'y of Health & Hum. Servs.*, No. 20-0243V, 2022 WL 17820891, at *12 (Fed. Cl. Nov. 16, 2022), however, it remains the determination of the Vaccine Program that the higher business rate is properly applied in the context of Vaccine Act cases. Therefore, based on the above, I award **$143.09** for Petitioner's travel expenses.

### IV.     Award for Lost Wages

The Vaccine Act provides for an award of a petitioner's "actual and anticipated loss of earnings," where "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). Compensation for lost wages "may not be based on speculation." *Moreland v. Sec'y of Health & Human Servs.*, No. 18-1319V, 2022 WL 10469047, at *3 (Fed. Cl. Spec. Mstr. Sept. 2, 2022).

Petitioner seeks reimbursement for lost wages for the nineteen weeks following her March 18, 2022 shoulder surgery. She states that she "took [this] time off from her work as a massage therapist to recover." Brief at 23. To determine her proposed sum, Petitioner has filed banking statements that establish that she earned approximately $5,773.15 from her massage therapy work during the eleven weeks preceding surgery – averaging approximately $524.80 per week.[3] Petitioner thus (based on a rate of $524.80 times nineteen weeks, "minus $650.00 deposited in April 2022, which was earned prior to her surgery, but deposited later,") calculates that she would have received $9.321.20, pre-tax. Respondent contends that an award for lost wages is not appropriate in this case because "[P]etitioner's presentation after the treatment gap is unrelated to [P]etitioner's SIRVA." Response at 20.

As previously noted, there is evidentiary support for the conclusion that Petitioner's surgery had *some* relationship to the SIRVA. Dr. Ackerman's findings in December 2021 were consistent with the conclusions he made three years earlier, and the results of Petitioner's 2018 and 2022 MRIs revealed the same issues. Moreover, the recommendation to pursue surgery was based on Petitioner's "continued symptoms," even if those symptoms were a mix of SIRVA and other shoulder deficits not attributable to it.

Nevertheless, the medical record does not fully corroborate Petitioner's implied contention that her ability to work in the nineteen weeks following surgery was impaired. By May 5, 2022 – around seven weeks after surgery – Petitioner reported feeling "90%

---

[3] Petitioner indicates that she earned $5,772.25 during this period; however, the correct figure is $5,773.15 – a difference of .09¢.

14

better," indicated that her pain ranged between a zero and a two on a ten-point pain scale, and stated that she was "thinking about trying to do some massage again." Ex. 31 at 10. And on May 23, 2022 – nine weeks and three days after her surgery - Petitioner rated her left shoulder pain as a zero on a ten-point pain scale, adding that her pre-operative symptoms had completely resolved. Ex. 32 at 6.

Petitioner is therefore entitled to an award for her lost wages based on a post-surgical convalesce of nine weeks and three days, totaling **$4,948.11**[4] **minus applicable taxes that would have been deducted from these earnings.** The parties will be ordered to submit a specific amount for past lost wages that includes applicable deductions.

### Conclusion

Based on the record as a whole and arguments of the parties, I award Petitioner a lump sum payment of **$82,043.44, (representing $75,000.00 for Petitioner's actual pain and suffering and $7,034.44 for past unreimbursable expenses)**.

**I also find that Petitioner is entitled to a pre-tax award of $4,948.11 for her lost wage claim. By no later than <u>Friday, February 22, 2025</u>, the parties shall submit a joint status report setting forth a specific amount for Petitioner's lost wages minus the applicable taxes that would have been deducted from these earnings.**

Once the issue of Petitioner's lost wage claim is resolved, I will issue a final damages decision

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[4] This figure is based on a weekly rate of $524.80 ($524.80 x 9) and daily rate of $74.97 ($74.97 x 3).